## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ASH BUCKLES,<br><br>                    Plaintiff,<br><br>v.<br><br>BRIDES CLUB, INC., et al.,<br><br>                    Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No. 2:08-cv-00849 CW<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

This matter is before the court on several motions to dismiss for lack of personal jurisdiction. Plaintiff Ash Buckles contends the court has general jurisdiction over Brides Club, Inc., or in the alternative, specific personal jurisdiction. He further contends that the court has specific personal jurisdiction over Brad Buckles, Munish Sangar, Ed Steenman, and Steenman Associates, Inc. For the reasons discussed below, the court concludes that it does not have general jurisdiction over Brides Club, Inc. It also does not have specific personal jurisdiction over Munish Sangar or Steenman Associates, Inc. It does, however, have specific personal jurisdiction over Brides Club, Inc., Brad Buckles, and Ed Steenman.

## <u>PROCEDURAL BACKGROUND</u>

Defendants Brides Club, Inc., Munish Sangar, and Brad Buckles (the "Initial Defendants") seek to dismiss the complaint against them for lack of personal jurisdiction. Following an evidentiary hearing on this matter, Ash Buckles ("Ash") filed an Amended Complaint. "It is well-established that an amended complaint supercedes an original complaint and renders the original

complaint without legal effect."[1]  Because the original complaint has been superceded, the motion

to dismiss it is moot.  The Initial Defendants, however, filed a second motion to dismiss, which

reasserts and incorporates both their initial motion and evidence from the evidentiary hearing.  The

Initial Defendants assert that the Amended Complaint does not alter the court's analysis regarding

personal jurisdiction over them.[2]  Plaintiff likewise incorporates his original briefing and evidence

presented at the evidentiary hearing.[3]  Thus, while the first motion to dismiss is moot, the court

nevertheless uses the briefing pertaining to it and evidence from the evidentiary hearing to decide

the second motion to dismiss.

When Plaintiff amended his complaint, he added Ed Steenman and Steenman Associates as

additional defendants.  The additional defendants also have filed a motion to dismiss based on the

same grounds as the Initial Defendants.  Accordingly, the court addresses that motion as well in its

analysis.

## FACTUAL BACKGROUND

### Ash's Employment and the Impersonating Blog

Brides Club, Inc. ("Brides Club") was formed by John Buckles in 2002.  It is a Nevada

Corporation, with its main headquarters in the State of Washington.  John Buckles' two sons, Brad

and Ash, worked for company after it was formed.  In September 2005, Brad purchased the company

---

[1] *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 928 (8th Cir. 2005) (citation omitted).

[2] Defendants' Mot. to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction, 1 (May 21, 2009) (Docket No. 51).

[3] Plaintiff's Opp'n to Defendants' Mot. to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction, 2 (Docket No. 62).

from his father.[4]  Ash continued to work for the company as an independent contractor, but was

based in Utah.[5]  Ash "oversaw the information systems of the company, which included the building,

the creation of the  [company] Web site, e-mail marketing, business meetings," and so forth.[6]  In

April 2008, Ash's contract terminated with Brides Club.[7]

On or about the time that Ash's contract terminated, Brides Club started experiencing

technical problems with its Web site, including problems with its blogs, Web photos, YouTube links,

security breaches, and other such disruptions.[8]  Brad testified that he believes Ash caused the

problems and masqueraded as "E Knight" to conceal that he was the one tampering with Brides

Club's Web site, links, and accounts.[9]  Brad further testified that he tried to resolve the situation with

Ash and obtain needed answers regarding the accounts and passwords, but he received no response

from Ash.[10]

---

[4]  Contract of Sale (Sept. 1, 2005) (Defendants' Evid. Hr. Ex. 2).  Ash contends that Brad has not fully paid his father for the company and therefore John Buckles remains a major shareholder. The Contract for Sale, however, states that upon the signing of the contract, all stock and assets of Brides Club were transferred to Brad.  Thus, while Brad may still be paying for the company, this does not mean that John Buckles remains a major shareholder.  Any claim for failure to make the required payments would be for breach of the purchase contract, which would not necessarily invalidate the transfer of the stock to Brad.

[5]  Hearing Tr., 25:17–26:10 (Docket No. 53).

[6]  *Id.* at 100:14–18.

[7]  *Id.* at 114:6–12.

[8]  *Id.* at 47:5–12.

[9]  *Id.* at 55:12–17; 56:18–57:6.

[10]  *See id.* at 51:25–52:11; 107:20–108:4.  Ash testified that he did respond to Brad's accusations and sent his response not only to Brad, but to their father and likely to Brad's attorney *Id.* at 108:11–23.

In Fall 2008, an "impersonating" blog appeared on the Internet that contained pictures of Ash and information that he lives in American Fork, Utah; thus, giving the appearance that Ash created the blog.  Under "Occupation," however, the blog stated that Ash was looking for work.[11] An entry on the blog was titled "Ash Buckles - Mastering the art of bringing [sic] hurtful to me."[12] The entry discussed that people have a public face and a private face and how people do destructive things in their private life.[13]  It then concluded, "My hope is to learn how to express myself clearly as I bring light to someone who has resolved to bring [sic] hurtful to me."[14]  The blog also contained a link to a false "LinkedIn" account.[15]  The false account similarly stated that Ash was looking for work and that he only had six months of experience in the Internet industry.[16]  Three  false domain names (ashbucklesblog.com; ashbuckles.net; and ashbuckles.org) also were created that linked to the false account.[17]  The registrant of the domain names was concealed.[18]  Subsequently, the service provider disclosed that the domain names were registered in Brides Club's name.[19]

---

[11]  E Knight Blog, 1 (Docket No. 11, Ex. A).

[12]  *Id.* at 2.

[13]  *Id.*

[14]  *Id.*

[15]  *Id.* at 1.

[16]  LinkedIn Account, 2 (Plaintiff's Evid. Hr. Ex. 8 ).

[17]  Hearing Tr., 54:21–55:3, 109:25–110:4 (Docket No. 53).

[18]  *Id.* at 111:15–16.

[19]  Declaration of Ash Buckles, ¶ 11 (Docket No. 11) (hereinafter "Ash Decl.").

Brad admits that he drafted the text of the blog.[20]  He testified that he did so "out of frustration" and to send a message to Ash that he knew who E Knight was.[21]  Brad did not inform Ash, though, that the blog existed.  Instead, he left it for Ash to eventually find through some other means.  Brad further testified that  Ed Steenman ("Steenman") registered the domain names and the blog for him.[22]  Steenman is an advertising agent that has done work for Brad.[23]  In a declaration submitted to the court, Steenman does not deny his involvement in the blog.  Instead he states,

> Any involvement I had in the blog site at issue in this case occurred
> exclusively within the State of Washington.  That involvement was
> not intended to benefit me or Steenman Associates . . . .[24]

After Ash discovered the blog, he had a telephone conversation with Brad.  Ash testified that Brad told him Sangar posted pictures of Ash on the impersonating blog.[25]  Despite Brad's statement to Ash on the telephone, at the evidentiary hearing, Brad testified that Sangar had no involvement in creating the blog or registering the domain names.[26]  Likewise, Sangar testified that he had had no involvement.[27]  No evidence besides Brad's statement on the telephone was presented to show that Sangar had any involvement with the blog or domain names.

---

[20]  Hearing Tr., 45:8–12 (Docket No. 53).

[21]  *Id.* at 56:18–57:6.

[22]  *Id.* at 55:1–8, 18–20.

[23]  *Id.* at 55:7–8.

[24]  Declaration of Ed Steenman, ¶ 21(June 10, 2009) (Docket No. 61).

[25]  Hearing Tr., 111:20–112:8.  Sangar is a web consultant that has done work for Brides Club. *Id.* at 7:19–8:2.

[26]  *Id.* at 49:9–14.

[27]  *Id.* at 10:19–11:16.

**Purported Injury Arising from the Blog**

Because of Ash's profession, he testified that the impersonating blog, false LinkedIn account, and false domain names were particularly damaging to his reputation. Ash works "in the field of online marketing [and] search engine optimization."[28]  Because the blog contained nonsensical expressions, anyone viewing it may consider it a mark against Ash's credibility.[29] Additionally, Ash testified that duplicate data can hurt a person's rankings with a search engine because controls exist to filter out duplicative sites.[30]  Thus, the creation of a false blog and LinkedIn account, with some similar information, potentially had a negative impact. Moreover, Ash testified that in Internet marketing there are "black hat" methods and "white hat" methods of doing business. Creation of multiple domain names that direct a person to the same site can be viewed as a dishonorable means of boosting rankings and doing business.[31]  Finally, the timing of the blog posting also was allegedly damaging. It occurred seven days before Ash spoke "at Word Camp Utah, which was published or broadcast around the world."[32]  Consequently, anyone who searched the Internet following the conference for information about Ash and his professional abilities could have seen the impersonating Web site that contained nonsensical language and said Ash was unemployed and had only six months of experience in the Internet field. Because Ash lives in Utah, the blog expressly identified he was from Utah, and Ash's main body of clientele is in Utah, Ash contends that Utah

---

[28]  *Id.* at 109:8–9.

[29]  *Id.* at 112:12–17.

[30]  *Id.* at 112:22–123:1.

[31]  *Id.* at 112:16–22.

[32]  *Id.* at 113:2–6.

was the targeted audience and that the defendants intended to harm him in Utah.

**Brides Club's Connection to Utah**

Besides this alleged conduct of the defendants, Ash further contends that the court has general jurisdiction over Brides Club.  Brides Club derives revenue through three sources.  It makes most of its income through managing trade shows and selling booth space.[33]  Brides Club also publishes a magazine that is a wedding show guide.[34]  Finally, Brides Club has a Web site where vendors can pay a fee and have access to information on the Web site and post information about their services or products.[35]

Prior to this lawsuit, Brides Club's Web site had approximately twenty-five pages of information about Utah vendors.[36]  Ash testified that he put the information on the Web site at Brad's direction.[37]  The alleged purpose of posting the information was to expand Brides Club's market.[38]  Ash's wife, Monica Buckles, also testified that she helped enter the information at Brad's direction,[39] and that the information was listed when "Utah was rolled out."[40]  The information contained

---

[33]  *Id.* at 23:2–4.

[34]  *Id.* at 23:6–10.

[35]  *Id.* at 34:21–35:5.

[36]  Brides Club Utah Web Site Pages (Plaintiff's Evid. Hr. Ex. 3).

[37]  Hearing Tr., 100:19–101:2 (Docket No. 53).

[38]  *Id.* at 101:3–7.

[39]  *Id.* at 115:13–25.

[40]  *Id.* at 116:12–13.

company names, telephone numbers, contact information, e-mail addresses, and so forth.[41]

Brides Club obtained this information by purchasing lists or searching other Web sites for the information.[42]  The vendors did not request that their information be listed, nor did they pay for the information.  Brides Club purportedly posted the information, though, to "jump start each market to kind of show that we were active and that we had a presence."[43]  Additionally, they hoped to "up sell" the listing,[44] whereby the vendors would pay forty dollars per month to enhance their listing and obtain access to information on the blog.  Brides Club also hoped to convince their national clients to increase their spending with Brides Club because of greater market penetration.[45]  Despite listing numerous Utah vendors, the evidence shows that only one to three Utah vendors paid the monthly fee for an enhanced listing.[46]  The evidence also shows that about five national vendors had their information posted on the Utah pages,[47] but specific evidence about the collective annual fees paid by the national vendors was not provided.  Brad did testify, however, that Brides Club's total revenue

---

[41]  *See* Brides Club Utah Web Site Pages (Plaintiff's Evid. Hr. Ex. 3); Hearing Tr., 102:8–12 (Docket No. 53).

[42]  Hearing Tr., 102:11–13 (Docket No. 53).

[43]  *Id.* at 102:18–19.

[44]  *Id.* at 102:20.

[45]  *See id.* at 102:20–23.

[46]  *Id.* at 35:6–13, 106:3–9, 142:6–7.

[47]  *See* Brides Club Utah Web Site Pages, at AB 185 (Aloha Beautiful Hawaii Weddings), AB 187 (Men's Wearhouse), AB 189 (Castle Honeymoons), AB 199 (Magnet Street Weddings), AB 205 (Barry Maier Photography) (Plaintiff's Evid. Hr. Ex. 3); Hearing Tr., 78:12–15, 96:8–12, 96:21–97:3 (Docket No. 53)

for 2008 for its trade shows, magazine, and Web site was between $1.5 million and $1.7 million.[48]

Evidence also was presented that Brides Club had a bridal lead generating program, whereby brides would register on the Brides Club Web site, and the company would send a list of leads to vendors.[49]  The evidence conflicted about how many leads were generated per week.  One e-mail indicated Brides Club generated 35 to 300 bridal names per week, but at that point the e-mail also indicates that Utah had not been launched.[50]  Another e-mail and flyer indicates that 54 leads per week are generated from Utah, but it is unclear whether Brides Club was the sole source of those leads.[51]  Ash testified that leads ranged "from 10 or 20 or 30,000 [a] year to 800,000 a year," but he could not state the number of Utah leads.[52]  It is therefore unclear how involved Brides Club was in generating leads from Utah.

Although disputed by Brad, Ash contends that he was the Chief Information Officer for Brides Club.[53]  Ash appears to have been employed as a 1099 employee or independent contractor of the corporation.[54]  He lived in Utah and performed his job duties from Utah by his choice.[55]  There is no evidence that Brides Club recruited employees in Utah or that anyone else associated with

---

[48]  Hearing Tr., 118:14–18 (Docket No. 53).

[49]  *See* E-mail re Enhanced Listings, 3 (Feb. 24, 2004) (Plaintiff's Evid. Hr. Ex. 4).

[50]  *Id.*

[51]  *See* E-mail and Flyer, at 3 (Plaintiff's Evid. Hr. Ex. 5).

[52]  Hearing Tr., 104:1–6.

[53]  *See* Ash Buckles Business Card (Plaintiff's Evid. Hr. Ex. 2).

[54]  *See* Employee Information (Defendants' Evid. Hr. Ex. 3).

[55]  *See* Hearing Tr., 25:15–23.

Brides Club worked in Utah.

In a declaration, Ash attested:

> From May 2005 to April 2008, I served as an agent of Brides Club in
> Utah.  I was asked repeatedly to scout competitive bridal shows, pick
> up competitive bridal magazines and do research to see if Utah was
> a viable market.  I was also asked to purchase a GM Hummer that
> could be wrapped in the Brides Club, Inc. brand for exposure in Utah
> since we were selling ads to Utah wedding professionals.[56]

Ash also contends that several Brides Club business meetings occurred in Utah and that his father

was both a resident of Utah and remained a major shareholder of Brides Club.[57]  As stated earlier,

however, there is contrary evidence about John Buckles' continued status as a shareholder.

Brad testified that Brides Club owns no property in Utah.[58]  It has never filed taxes in Utah

and has no office in Utah.[59]  Brides Club has never done a trade show in Utah,[60] nor was any

evidence presented to show that Brides Club is or was licensed to do business in Utah,  Additionally,

there was no evidence that Brides Club has a bank account, telephone line, or fax line in Utah.

## ANALYSIS

### I.    BURDEN OF PROOF

Defendants have moved to dismiss the Complaint for lack of personal jurisdiction under Rule

12(b)(2) of the *Federal Rules of Civil Procedure*.  Plaintiff has the burden, though, "of establishing

---

[56]  Ash Decl., ¶ 15 (Docket No. 11).

[57]  *Id.* ¶ 16.

[58]  Hearing Tr., 23:25–24:1 (Docket No. 53).

[59]  *Id.* at 24:2–8.

[60]  *Id.* at 28:21–22.

personal jurisdiction."[61]  When deciding a personal jurisdiction challenge, a court has the discretion

to resolve it "by reference to the complaint and affidavits, a pre-trial evidentiary hearing, or

sometimes at trial itself."[62]  If the court only relies upon the complaint and affidavits, the plaintiff

merely needs to "make a *prima facie* showing of personal jurisdiction."[63]  If the court holds an

evidentiary hearing, however, the plaintiff's burden of proof is heavier—it changes from *prima facie*

to proof by a preponderance of the evidence.[64]  Because the court held an evidentiary hearing in this

matter, Ash must establish by a preponderance of the evidence that the court has personal jurisdiction

over the defendants.

## II.    GENERAL PERSONAL JURISDICTION

Ash contends that Brides Club's contacts with Utah are substantial enough that the court may

exercise general jurisdiction over it.  "[W]hen the suit does not arise from or relate to the defendant's

contacts with the forum and jurisdiction is based on the defendant's presence or accumulated

contacts with the forum, the court exercises 'general jurisdiction.'"[65]  Due process requires, however,

"systematic and continuous contacts with the forum state to justify general personal jurisdiction."[66]

Factors that are helpful in evaluating a corporation's contacts include, among other things, whether

---

[61]  *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 (10th Cir. 2008) (citation omitted).

[62]  *Id.*

[63]  *Id.* at 1070 (citation omitted).

[64]  *Id.* at 1070 n.4 (citation omitted).

[65]  *Hargrave v. Concord Moon, L.P.*, 278 Fed. Appx. 853, 855 (10th Cir. 2008) (quotations and citation omitted).

[66]  *Id.* (citation omitted).

the corporation (1) is "licensed to do business in the [forum] state," (2) maintains an office, employees, telephone line or bank account in the forum state, (3) pays taxes in the forum state, (4) owns property in the forum state, (5) advertises, solicits business, recruits employees, or sends salespersons to the forum state, and (6) "generat[es] a substantial percentage of its national sales through revenue generated from in-state customers."[67]

Applying these factors to Brides Club's contacts with Utah, it is apparent that Brides Club has not had systematic and continuous contacts with Utah.  It is not licensed to do business in Utah, nor does it maintain an office, telephone, or bank accounts in the forum state.  While Ash did work in Utah, that was at Ash's instigation and not for Brides Club's benefit.  Brides Club does not pay taxes or own any property in Utah.  There is evidence to support that Brides Club has done some advertising in Utah and has generated a small profit from Utah vendors.  Such revenue, however, is *de minimus* in comparison to Brides Club's national sales.  Moreover, merely listing Utah vendors on Brides Club's Web site to make it *appear* as though Brides Club has a presence in Utah does not in actuality *create* the type of contact with Utah that is necessary to support general jurisdiction.  Taken together, Ash has failed to establish by a preponderance of the evidence that Brides Club has systematic and continuous contacts with Utah.  The court therefore concludes that it does not have general personal jurisdiction over Brides Club.

## III.   SPECIFIC PERSONAL JURISDICTION

### A.   Due Process Requirements

Next, Ash asserts that the court has specific personal jurisdiction over all defendants.  To

---

[67] *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295–96 (10th Cir. 1999) (citation omitted).

establish specific personal jurisdiction, one must show that a defendant has minimum contacts with the forum state. A defendant has minimum contacts when (1) the defendant "purposefully directed its activities at residents of the forum state," and (2) "the plaintiff's injuries [arose] out of defendant's forum-related activities."[68] Besides proving minimum contacts, a plaintiff also must show that "exercising personal jurisdiction" does not offend "traditional notions of fair play and substantial justice."[69]

### B.  Munish Sangar

Ash and his wife Monica Buckles both testified that Brad had said Sangar posted pictures of Ash on the impersonating blog. At the evidentiary hearing, however, Brad and Sangar testified that Sangar had no involvement in creating the blog. Besides the testimony about what he claimed Brad had said about Sangar, Ash provided no other evidence that Sangar was involved with the blog. The court finds the evidence is insufficient to establish that Sangar had minimum contacts with Utah. Accordingly, Sangar is hereby dismissed from this action.

### C.  Brad Buckles

#### 1.  Minimum Contacts

Brad contends that he has not had minimum contacts with Utah because the impersonating blog was created in Washington and it was a passive Web site that merely provided information to an unspecified audience. He relies upon *Zippo Manufacturing Company v. Zippo Dot Com, Inc.* to

---

[68] *Dudnikov*, 514 F.3d at 1071 (quotations omitted) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

[69] *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

support his contention.[70]  *Zippo* is an oft-cited opinion in which the court focused on a Web site's level of interactivity to determine whether it was appropriate to exercise personal jurisdiction.[71]  As the Internet has evolved and new technology has emerged, some courts and legal scholars have started to question whether "new guidelines and rules" actually are needed, "or is justice better served by adherence to traditional [principles] of personal jurisdiction?"[72]  Under traditional principles, the focus is "on the conduct of the defendant, rather than the sophistication" or level of interactivity of the defendant's Web site.[73]

Prior to *Zippo*, the Supreme Court issued *Calder v. Jones*.  The case involved a defamation suit brought in California against individuals in Florida.[74]  The defendants wrote and edited an article in Florida about the plaintiff who resided and worked in California.[75]  "The article was published in a national magazine with a large circulation in California."[76]  In fact, California sold "almost twice the level of the next highest State."[77]  The article "impugned the professionalism of an entertainer

---

[70]  *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).

[71]  *See id.* at 1124.

[72]  Anne Sikes Hornsby, *Internet Transactions and Communications: Expanding or Contracting Traditional Notions of Personal Jurisdiction?*, 70 Ala. Law. 378, 379 (Sept. 2009).

[73]  Yvonne Beshany & Sean Shirley, *Cyber-Jurisdiction:  When Does Use of the Internet Establish Personal Jurisdiction?*, 63 Ala. Law. 36, *40 (Jan. 2002).

[74]  *Calder v. Jones*, 465 U.S. 783, 784 (1984).

[75]  *Id.*

[76]  *Id.*

[77]  *Id.* at 785.

whose television career was centered in California."[78]   Moreover, the brunt of the harm was felt in California by the plaintiff.[79]   Thus, "California [was] the focal point both of the story and of the harm suffered."[80]

Although the magazine had a large circulation in California, Calder, himself, had only traveled to California twice—once for pleasure and another "to testify in an unrelated trial."[81]   He had "no direct economic stake" in the magazines' sales in California.[82]   Consequently, Calder opposed California's exercise of personal jurisdiction over him.

The Supreme Court rejected Calder's contention because he was "not charged with mere untargeted negligence."[83]   Rather, his acts were intentional and "aimed at California."[84]   The Court reached this conclusion because Calder knew the article "would have a potentially devastating impact upon" the plaintiff, and that the injury would occur where the plaintiff worked and lived.[85]   As a result, Calder could "reasonably anticipate being haled into court" in California.[86]   In essence, *Calder* states that purposeful availment exists if (1) a defendant has committed "an intentional [act]"

---

[78]   *Id.* at 788.

[79]   *Id.* at 789.

[80]   *Id.*

[81]   *Id.* at 786.

[82]   *Id.* at 789.

[83]   *Id.*

[84]   *Id.*

[85]   *Id.* at 789–90.

[86]   *Id.* at 790 (quotations and citation omitted).

(2) that was "aimed at the forum state" (3) with the "knowledge that the brunt of the injury would be felt in the forum state."[87]  While *Zippo* is instructive in certain cases, the court finds the *Calder* analysis more applicable here.

Although this case deals with an Internet blog rather than a magazine, the medium of communication is not the relevant question.  Instead, the relevant question is Brad's conduct.  Brad wrote and edited the impersonating blog.  He also directed the registration of three domain names related to Ash's name and was involved in the creation of a false LinkedIn account.  These acts constitute intentional conduct and satisfy the first prong of the "conduct analysis."  Notably,  Brad does not dispute this.[88]  Instead, Brad contends that his conduct was not aimed at the forum state. The court disagrees.

Brad testified that he wanted to send a message to Ash.  Rather than sending the message through a private medium, Brad created an impersonating blog that contained information only related to Utah.  The blog also contained information about Ash's profession and contacts or the purported lack thereof.  False domain names (with the registrant's name hidden) routed traffic to a false LinkedIn account, which also negatively represented Ash's professional contacts.  It is not credible that Brad would go through the effort of creating a false blog, three false domain names of a hidden origin, and a false LinkedIn account that impugn Ash's professional abilities solely because he wanted to send a personal message to Ash.  Ash works as an online-marketer and deals with search engine optimization.  His Internet presence is crucial to his business.  Moreover, his main clientele is located in Utah, and it is those individuals who would be most interested in Ash's

---

[87] *Dudnikov*, 514 F.3d at 1072.

[88] *See* Hearing Tr., 121:13–122:3 (Docket No. 53).

professional abilities, reputation, and contacts. Based on the nature and extent of Brad's intentional

acts, the court concludes that Brad's conduct was aimed at Utah. The court further concludes that

Brad took such action with the knowledge that the brunt of the injury would be felt in Utah. Utah

is where Ash lives, works, and has his main clientele. In all material respects, Brad's actions mirror

those of Calder. Thus, the court finds that Brad has had sufficient contact with Utah to satisfy the

minimum contacts standard.

### 2.    Fair Play and Substantial Justice

Because Ash has satisfied the minimum contacts standard, the burden now shifts to Brad "to

'present a compelling case that the presence of some other considerations would render jurisdiction

unreasonable.'"[89] As the Tenth Circuit has noted, it is a rare case where a defendant is able to

demonstrate that the exercise of personal jurisdiction offends traditional notions of fair play and

substantial justice.[90]    Typically, courts look at the following five factors in making this

determination:

> [1] the burden on the defendant, [2] the forum state's interest in
> resolving the dispute, [3] the plaintiff's interest in obtaining
> convenient and effective relief, [4] the interstate judicial system's
> interest in obtaining the most efficient resolution of controversies,
> and [5] the shared interest of the several states in furthering
> fundamental social policies.[91]

Brad provided little information as to how the factors apply in this case, and the court will not make

his arguments for him. The court therefore concludes that Brad is subject to specific personal

---

[89] *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009) (quoting *Burger King*, 471 U.S. at 477).

[90] *Id.*

[91] *Id.* (citing *Burger King*, 471 U.S. at 469).

jurisdiction in Utah.

**D.     Brides Club**

Brides Club also contends that it did not have sufficient contacts with Utah for the court to

exert personal jurisdiction over it.  Brides Club is a Nevada corporation.  "[A] nonresident corporate

entity creates contacts for personal jurisdiction purposes through its authorized representatives:  its

employees, directors, officers and agents."[92]  Although "an artificial entity" can only act through its

authorized representative, this does not mean that "any and all conduct by one who at times also acts

on a corporation's behalf" should be imputed to the corporation.[93]  Instead, one must act within his

scope of authority and for the purpose of furthering the interest of the employer for an act to be

imputed to the corporation.[94]

> Scope of authority refers to those acts which are so closely connected
> with what the servant is employed to do, and so fairly and reasonably
> incidental to it, that they may be regarded as methods, even though
> quite improper ones, of carrying out the objectives of the
> employment.[95]

In this case, Brad is the President of Brides Club.  He purportedly created the impersonating

blog in response to Ash's alleged tampering with Brides Club's Web site and other technology.

Certainly, a president of a corporation is expected to act to advance the interests of the corporation.

It is not necessary that the act in fact further the interests of the corporation, but rather that the actor

---

[92] *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 458 (10th Cir. 1996) (citing *Int'l Shoe*, 326 U.S. at 316)).

[93] *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (citations omitted)

[94] *Id.* (quotations and citation omitted).

[95] *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 26, 61 P.3d 1009 (quotations and citations omitted).

intends that result.  The act may in fact be wrongful and in reality injure the corporation.  While the method Brad employed to protect Brides Club may have been improper, he nevertheless acted within the scope of his authority.  Moreover, he employed Brides Club's resources to carry out his plan. He had three false domain names registered in Brides Club's name and he used Ed Steenman, an advertising agent for Brides Club, to help him.  Based on these factors, the court concludes that Brad's actions may be imputed to Brides Club, and that the court has specific personal jurisdiction over Brides Club.

### E.    Ed Steenman and Steenman Associates, Inc.

#### 1.    Ed Steenman

Ed Steenman is the President and Chief Executive Officer of Steenman Associates.  Based on his own declaration, Steenman was involved with the impersonating blog.  Brad testified that Steenman is the person who had the three false domain names registered and who set-up the false LinkedIn account.  Steenman also posted the blog and then eventually took it down.  Although Steenman denies in his declaration that he targeted Utah and that he intended to harm Ash in any way, his statements are conclusory, with no supporting evidence or explanation.  Viewing the evidence in totality, the court concludes that it may exercise specific personal jurisdiction over Steenman for the same reasons that it is exercising specific personal jurisdiction over Brad.

#### 2.    Steenman Associates, Inc.

It is unclear from the evidence the conditions under which Ed Steenman became involved with the impersonating blog.  According to the testimony, Steenman knows Brad and Ash, but the nature of their acquaintance was not stated.  As a result, while Brad used Steenman's skills, no evidence was presented to show that Steenman was acting within the scope of his employment at

Steenman Associates, Inc. or for the purpose of furthering the interests of that company.

Accordingly, the court cannot impute Steenman's actions to Steenman Associates, Inc. The court

therefore dismisses Steenman Associates, Inc., but does so without prejudice. If discovery shows

that Steenman acted within the scope of his authority and to further the interests of Steenman

Associates, Inc. Ash may seek leave to add the corporation as a defendant.

## III.   OTHER MOTIONS

### A.   Motion to Strike Ash Buckles' Declaration

The Initial Defendants also have moved to strike various parts of Ash Buckles' declaration

on the basis that they are "argumentative, speculative, without proper foundation, not based on

personal knowledge, conclusory, and/or violative of the best evidence rule."[96] The court's decision

cites to paragraphs 11, 15, and 16 of Ash's declaration. Of these paragraphs, the Initial Defendants

have only moved to strike paragraph 16. Although the court cited to paragraph 16, it noted that

other evidence contests the accuracy of the representations in that paragraph. The court therefore

did not rely on paragraph 16 in reaching its conclusions. Because the court did not rely upon

paragraph 16, the court denies as moot, the Initial Defendants' motion to strike.

### B.   Motion to File Supplemental Briefing

Ash has moved to file supplemental briefing pertaining to declarations by his father, John

Buckles. At the evidentiary hearing, Ash sought to introduce John Buckles' first declaration. The

court did not admit it as evidence due to objections that were made by the Initial Defendants. After

the hearing, the defendants then filed their own declaration from John Buckles, which contradicts

---

[96] Defendants' Mot. to Strike Portions of the Declaration of Ash Buckles , at 1 (Docket No. 23).

the first declaration.  Ash seeks to explain the contradictions in his supplemental briefing.

Subsequently, Ash then filed a third declaration from his father, which contradicts the second

declaration.  Because the initial declaration was not received into evidence, and the subsequent

declarations only provide contradictory evidence, the court disregarded them in its analysis.

Accordingly, no supplemental briefing is needed to address the contradictions in the declarations,

and the court denies as moot the motion to supplement.

## CONCLUSION

For the reasons stated above,

1.      The Initial Defendants' first motion to dismiss is DENIED AS MOOT.[97]

2.      The Initial Defendants' second motion to dismiss is GRANTED IN PART and

DENIED IN PART.[98]  The court grants the motion with respect to Munish Sangar and hereby

dismisses him from the case.  Although the court finds that is does not have general jurisdiction over

Brides Club, it denies the motion to dismiss as to Brides Club because the court finds that it has

specific personal jurisdiction over it.  The court also denies the motion as to Brad Buckles.

3.      The third motion to dismiss, filed by Ed Steenman and Steenman Associates, Inc.,

is GRANTED IN PART and DENIED IN PART.[99]  The court grants the motion with respect to

Steenman Associates, Inc. and hereby dismisses it without prejudice.  The court denies the motion

as to Ed Steenman.

4.      The court DENIES AS MOOT, the Initial Defendants' Motion to Strike Portions of

---

[97]  Docket No. 6.

[98]  Docket No. 51.

[99]  Docket No. 59.

the Declaration of Ash Buckles.[100]

     5.    The court also DENIES AS MOOT, Ash Buckles Motion for Leave to File Supplemental Brief.[101]

     DATED this 10th day of August, 2010.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[100]  Docket No. 23.

[101]  Docket No. 65.